Rupa Nath Cook (SBN: 296130)
Norman Xavier (SBN: 361995)
**NATH COOK LAW PC**
100 Pine St, Ste 1250
San Francisco, CA 94111-5235
Tel: 714-335-2266
Email: rupa@nathcook.com

*Attorney for Plaintiffs Luc Troussieux*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUC TROUSSIEUX, an individual<br><br>Plaintiff<br><br>v.<br><br>JONATHAN SEGALI, an individual; GOOD WORKS DRONE SHOWS LLC, a Nevada Limited Liability Company,<br><br>Defendants. | Case No.: 25-CV-05939-JCS<br><br>**DECLARATION OF JESSE ASOAU IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT**<br><br>Date: December 17, 2025<br>Time: 9:30 a.m.<br>Dept: 9<br>Judge: Hon. Joseph C. Spero<br><br>*Complaint Filed: July 15, 2025* |

I, Jesse Asoau, declare as follows:

1. I make this declaration in support of Luc Troussieux's Motion for Entry of Default Judgment against Defendants Jonathan Segali ("Segali") and Good Works Drone Shows LLC ("Good Works"). I have personal knowledge of the matters set forth herein, and if called as a witness, I would competently testify thereto.

2. I know Defendant Jonathan Segali from working for him in 2019 under his companies, Go Out Local and Go Drones. In or around October 2023, I learned about legal

-1-

claims against the companies and Segali by Bannock County, Idaho, and quit my job because I did not like what I learned and did not want to be associated with the claims.

3. In or around December 2023, I learned that a company named Skyworx had bought out Go Drones. Shortly thereafter, I called Skyworks and asked if they needed help with sales. I was hesitant to work with Segali again, but agreed to since Skyworkx was owned and operated by someone else. I worked for Skyworx from the end of 2023 through approximately October 2024.

4. In September 2024, while I was working remotely for Skyworx from Tennessee, I received a call from Segali informing me that Skyworkx's warehouse in Las Vegas caught fire and he needed my help managing it. Segali promised me a $5,000 relocation fee. On Segali's promises, I moved from Tennessee to Las Vegas. I was never paid any relocation fee.

5. I ended up living in Segali's house for a short period of time. At that time, Segali lived in a nice place at Turnberry Towers in Las Vegas, and lived a lavish lifestyle.

6. In or around October 2024, I learned that Segali was being fired from Skyworx. Around the same period of time, Segali called me and told me he was starting a company, Good Works, for which he was receiving a significant investment from Plaintiff. He asked me to be a part of this company as a 10% owner. Segali noted that I would be in charge of operations and he would handle sales and finances. I agreed.

7. From October through December 2024, I loaned Segali a total of $5,000 towards capitalization of Good Works. I never saw that money again.

8. In late 2024, Segali informed me that Plaintiff had agreed to invest $750,000 in Good Works and that Good Works would use the money to buy drones and a truck and trailer and cover payroll and other business expenses.

9. In early 2025, Good Works bought a truck and trailer. On or around April 2025, on a drive back from Texas, the truck started experiencing electrical issues so I took the truck and trailer to a shop for repairs. Segali called me upset that I had taken the vehicles to the shop and directed me to leave them there. I later learned that Segali had sold the truck and trailer to a mutual friend who owned a car dealership. I have no idea what happened to the proceeds of that sale.

10. In January 2025, my paycheck from Good Works was late. When I confronted Segali about this, Segali said that there were cashflow issues because Plaintiff was sending his $750,000 investment in increments instead of one lump sum.

11. Around this time, I noticed other cashflow issues with Good Works. In February 2025, Good Works was scheduled to do a drone show in Chinatown San Francisco. Good Works did not own drones at this time, so I had to drive to Texas to pick up drones for the show. When I arrived in Texas, I was informed that the drone company had not yet been paid and, therefore, could not release the drones. Ultimately, after speaking with Segali, the drone company agreed to release the drones. However, this caused delays and uncertainty for the drone show.

12. I also began receiving calls and notifications from other vendors, including FedEx/freight couriers and designers, noting that they were not being paid.

13. I also witnessed Segali misleading vendors. On one occasion, I discovered—5 hours before the start of a drone show—that necessary software had not been paid for. Segali informed the vendor that a wire was being sent, but I later learned that, unbeknownst to the vendor, Segali had cancelled the wire in the middle of the night.

14. On one occasion, while I was driving the truck and trailer to a drone show, Good Works' credit card was declined, and I was not able to put gas in the truck. I had to

sleep in the truck while I waited for Segali to transfer funds to the Company's account. When I confronted Segali about this, Segali became agitated and said, "stay in your lane."

15. As a result of these cash flow issues, Good Works' services, including those provided to Plaintiff's company Smart Meetings, were compromised. Work was not properly completed or was delayed, and drone shows had to be cancelled.

16. On or around March 2025, Segali informed me that Good Works would continue to rent drones instead of purchasing drones. This was a red flag and made me realize that Segali and Good Works were using client deposits to fund drone rentals and may not have Plaintiff's money—or any money for that matter—any longer.

17. At the same time that Good Works was experiencing cash flow issues, I witnessed Segali spending $20,000 on a blackjack game and pulling $5,000 at a time from ATMs in Las Vegas. When I confronted him about this and reminded him that I had not been fully paid my salary, Segali responded that this was his personal money earned from commissions. I also learned from a Good Works employee that, around this same time, Segali was enjoying lavish nights out, including spending $800 on caviar at dinner followed by expensive gambling.

18. I confronted Segali's behavior in May 2025, but Segali was evasive, aggressive, and avoided my questions. In many of my confrontations with Segali about Good Work's cashflow issues, Segali would repeatedly blame Plaintiff and note that Plaintiff was late in his contributions or had not invested the full $750,000.

19. In early May 2025, I called Plaintiff to ask him about his investment and the cash flow issues I was experiencing with Segali. This was the first time I learned that Plaintiff had invested the $750,000 in full.

20. Segali and Good Works' actions have caused me tremendous damage. Among other things, I was never paid my salary as promised under my employment terms with Good Works; rather, Segali would send me random sums through cash or Venmo. I have also not received any of the additional funds promised to me, like relocation fee or a housing stipend, or repayment of the $5,000 loan I gave Segali. Because of Segali's fraud, my wife and I were forced out of our home and had to sleep in our car for 70 days.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 8, 2025, in Boise, Idaho.

/s/ Jesse Asoau
Jesse Asoau