UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUC TROUSSIEUX,<br><br>            Plaintiff,<br><br>    v.<br><br>JONATHAN SEGALI, et al.,<br><br>            Defendants. | Case No.  25-cv-05939-JCS<br><br>**REPORT AND RECOMMENDATION RE MOTION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. No. 15 |

## I.      INTRODUCTION

Plaintiff Luc Troussieux brought this action against Defendants Jonathan Segali and Segali's company, Good Works Drone Shows LLC ("Good Works"), asserting, *inter alia*, claims for fraud and conversion against both defendants.  Neither defendant appeared and the Clerk entered their defaults.  Dkt. no. 12.  Troussieux brought a Motion for Default Judgment ("Motion"), which is presently before the Court. Although Troussieux requested in the Motion that the Court enter default judgment against both defendants, he subsequently filed a dismissal without prejudice of Good Works and now seeks entry of default judgment only as to Segali.  A hearing on the Motion was held on June 3, 2026.  Because all parties have not appeared and consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c), this case will be reassigned to a district judge for further action.  The Court's recommendations are set forth below.

## II.     BACKGROUND

### A.      The Complaint

Troussieux is a resident of California.  Compl. ¶ 4.  He alleges that at all relevant times, Segali was a resident of Nevada.  *Id.*  ¶ 5.  Segali "is the managing member of Good Works,

United States District Court
Northern District of California

owning 90% of the interests in Good Works, and is also the agent for service of process for Good Works." *Id.* Good Works is a limited liability company organized under the laws of the State of Nevada, with its principal place of business in Las Vegas, Nevada. *Id.* ¶ 6. According to Troussieux, Good Works also does business nationwide, including in California. *Id.*

Troussieux is the managing member of "Bright Business[,]" which is "a leading meetings industry publisher, hosting luxury networking events on a global scale, publishing meetings content in print and digital magazines producing webinars and podcasts, and offering a variety of other digital resources." *Id.* ¶ 12. He alleges that he met Segali between 2022 and 2024, when Bright Business used a third-party drone company that Segali was affiliated with "to provide photography and videography services for Bright Business's live events." *Id.* ¶ 13.

In September or October of 2024, Segali told Troussieux he was going to start his own drone company, Good Works, and solicited investment in Good Works from Troussieux, who was in California at the time. *Id.* ¶¶ 13-14. According to Troussieux, Segali asked him "to invest in Good Works in order to help capitalize the Company and so that the Company could purchase necessary equipment[,]" and "assured Plaintiff that his investment would be used solely for legitimate business purposes associated with the Company." *Id.* ¶¶ 14-15. In particular, he alleges that:

> [I]n or around the fall of 2024, Segali represented to Plaintiff that his investment would be used to repurchase drone equipment that Segali sold in November of 2024 to an individual in Texas, and that Segali was also going to purchase a truck and trailer to assist in operating the business. Segali and Plaintiff's conversations about Plaintiff's investment in the Company largely occurred while Plaintiff was in California (over phone, text messages, emails, and a few in-person encounters).

*Id.* Troussieux further alleges that in reliance on Segali's representations, he "agreed to invest $750,000 . . . in exchange for a ten percent (10%) membership interest in the Company." *Id.* ¶ 16. The agreement was set forth in a Contribution Agreement that was "signed by Segali on behalf of Good Works on December 27, 2024 and by Plaintiff in California on December 30, 2024." *Id.* & Compl. Ex. 1 (Contribution Agreement).

The Contribution Agreement stated, in the Recitals, that Troussieux "desire[d] to

2

contribute capital to [Good Works] in exchange for an equity interest in [Good Works]." Compl., Ex. 1. It provided, in relevant part:

1. Contribution of Capital

1.1 Contribution: The Contributor agrees to contribute the sum of Seven Hundred and Fifty Thousand Dollars ($750,000) (the "Capital Contribution") to the Company in cash, payable to the Company's designated account at the Closing (as defined in Section 4 below).

1.2 Use of Contribution: The Capital Contribution will be used for capitalization of the Company, including the Company's operational expenses, investment, working capital, equipment.

2. Issuance of Equity

2.1 Equity Interest: In exchange for the Capital Contribution, at the Closing, the Company agrees to issue to the Contributor ten percent (10%) of the membership interests in the Company (the "Equity Interest"), free of encumbrances. The Equity Interest shall be duly-authorized and validly-issued. The Equity Interest shall be subject to the terms of the Company's Operating Agreement, as amended from time to time.

. . .

4. Rights and Obligations of the Contributor

4.1 Rights: As a member of the Company, the Contributor will have the following rights, subject to the terms of the Operating Agreement:

● The right to participate in the profits and losses of the Company.
● The right to vote in accordance with the Operating Agreement.
● The right to receive distributions in accordance with the Operating Agreement.

4.2 Obligations: The Contributor agrees to comply with the provisions of the Operating Agreement and any applicable laws or regulations governing the Company's operations.

. . .

7.3 Governing Law: This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

*Id.* Pursuant to the Contribution Agreement, "[b]etween December 2024 and April 2025, Plaintiff transferred a total of $750,000 to Good Works in exchange for a 10% membership interest in the company." *Id.* ¶ 17.

With respect to the Operating Agreement, Troussieux alleges:

3

> Through his signing of the Contribution Agreement, Plaintiff, along with the other members of the Company (including Segali), became subject to the Company's operating agreement (the Operating Agreement") referenced therein. Among other duties and responsibilities, the Operating Agreement provided that Segali, as manager of the Company, has "a fiduciary duty of loyalty and care similar to that of managers of business corporations organized under the laws of Nevada." The Operating Agreement further provides that all financial records "will be held at the Company's primary business address and will be accessible to all Members." In addition, the Operating Agreement imposes on the Board of Managers of the Company the duty to "[m]aintain its own books, records, accounts, financial statements…" and to "[n]ot commingle its assets with assets of the Members or any other person, and separately identify, maintain, and segregate all Company assets. The Operating Agreement also requires the Company to 'Maintain an arm's length relationship with the Members.'"

*Id.* ¶ 18.

Troussieux alleges that in early 2025, Bright Business entered into an agreement with Good Works whereby Good Works was to "perform drone shows for Bright Business's events on the following dates: February 9, 2025, March 9, 2025, May 18, 2025, August 3, 2025, September 3, 2025, September 11, 2025, October 26, 2025." *Id.* ¶ 19. Troussieux alleges:

> The events would be held at various locations, including in: San Diego, California; Santa Fe, New Mexico; Atlantic City, New Jersey; Nassau, Bahamas; Orlando, Florida; Tampa, Florida; and Napa, California. In exchange for its performance, Bright Business would pay Good Works $8,000 per show or $64,000 total. Bright Business paid Good Works a $32,000 deposit for these shows up front. The parties' drone show agreement contained a choice of law provision requiring all disputes to be governed under California law with jurisdiction in Ventura County, California.

*Id.* According to Troussieux, Good Works provided drone shows for Bright Business on February 9, 2025 and March 9, 2025 but it "rented drones to perform these shows and had not yet purchased its own drones as promised." *Id.* ¶ 20.

At one of these events, Troussieux talked to Segali, who "represented to Plaintiff that the Company was doing well, had purchased equipment, and was booking events." *Id.* ¶ 21. Troussieux alleges that he "asked Segali to keep him updated about the status of the Company and to share financials[,]" which Segali agreed to do, but that Segali never provided the requested information, even after Troussieux contacted Segali in April 2025 to request an update on Good Works' financial status. *Id.* ¶¶ 21-22.

4

Troussieux alleges that Good Works was "scheduled to perform a drone show at Bright Business's event on Monday, May 19, 2025 in Atlantic City, New Jersey" and that "[u]p until the date of the event, Segali and Good Works indicated that they would attend and perform their obligations." *Id.* ¶ 23. "However, on the morning of the event, no one from [Good Works], including Segali, showed up" and "[w]hen Plaintiff called Segali to inquire about his whereabouts, Segali stated that he had engaged another drone company, LunaLite Drone Show Tech ("LunaLite"), to perform the services on Good Works's behalf." *Id.* When Troussieux contacted LunaLite, he was told that Good Works had contacted them on Friday afternoon asking it to "design[ ] and program[ ] a show in less than 72 [hours]" and that although LunaLite "gave it a shot" it ultimately had to notify Segali that it would not be able to produce a show with so little time. *Id.* ¶ 24. This experience indicated to Troussieux that "something was wrong" and that Good Works might not be fulfilling its obligations to "other customers and prospects." *Id.* ¶ 25. He also became "suspicious that Good Works had not purchased any drones or other equipment." *Id.*

According to Troussieux, at this point he began to inquire about Segali and "learned that Segali had a history of financial and legal issues in his past business dealings, leading Plaintiff to further suspect that Segali had used Plaintiff's investment in the Company for his own personal benefit." *Id.* ¶ 26. Troussieux made repeated requests for financial information but Segali "failed to provide the requested information and instead engaged in evasive behavior, offering vague or inconsistent responses that effectively prevented Plaintiff from obtaining any details about the Company, Plaintiff's investment, and the Company's operations." *Id.* ¶ 27.

Troussieux alleges that on May 29, 2025, he "exercised his rights as a 10% member of the Company and formally demanded information concerning the Company's business and affairs." *Id.* ¶ 28 & Ex. 2 (written request). Troussieux sent his written request by text, email, Federal Express, and certified U.S. Mail and Segali promised to provide the requested information but never did so. *Id.* ¶¶ 28-29.

In the Complaint, Troussieux alleges that Good Works is the alter ego of Segali. *Id.* ¶¶ 30-36. In particular, the Complaint contains the following alter ego allegations:

5

30. On information and belief, Good Works is the alter ego of Segali, and there exists such a unity of interest and ownership between Segali and Good Works that their separate personalities no longer exist. Adherence to the fiction of a separate corporate existence would, under the circumstances, sanction a fraud and promote injustice against Plaintiff.

31. Sole and Dominating Control: At all relevant times, Segali was the managing member and exercised sole and dominating control over Good Works. He made all material decisions for the Company, often without regard for the interests of the Company or its other members and treated the Company's business as his own.

32. Commingling of Funds and Assets: On information and belief, Segali failed to maintain a distinction between his personal assets and the assets of Good Works. On information and belief, he commingled Company funds with his own and used the $750,000 Capital Contribution from Plaintiff for his own personal benefit rather than for the contractually-required purpose of capitalizing the Company and purchasing equipment. This conduct is in direct violation of the Operating Agreement, which explicitly forbids commingling assets and requires the Company to pay its own liabilities from its own funds.

33. Disregard of Corporate Formalities: Segali has systematically disregarded the corporate formalities required by the Operating Agreement and applicable law. He has failed to maintain proper books and records, refused to provide financial statements or Company information to Plaintiff upon repeated requests, and has not observed the formal requirements of operating a limited liability company. This violates the Operating Agreement, which mandates that records be maintained and accessible to all members.

34. Inadequate Capitalization : On information and belief, Good Works was inadequately capitalized from its inception, or was rendered so by Segali's misappropriation of Plaintiff's Capital Contribution. The Company rented drones for its initial shows, indicating it did not possess the fundamental assets necessary for its business, which Plaintiff's $750,000 Capital Contribution was intended to purchase.

35. Use of the LLC to Perpetrate Fraud: Segali used Good Works as an instrument to perpetrate fraud. He made false representations to induce Plaintiff's investment, promising the funds would be used for equipment, while intending to convert the funds for his personal use. Upholding the corporate shield would allow Segali to escape liability for his fraudulent conduct.

36. For these reasons, the corporate veil of Good Works should be pierced, and Segali should be held personally liable for the debts and obligations of Good Works owed to Plaintiff.

*Id.*

Troussieux asserts the following claims in his complaint: 1) conversion (Segali and Good

6

Works); 2) fraud (Segali and Good Works); 3) negligent misrepresentation (Segali and Good Works); 4) breach of Contribution Agreement (Segali);  5) breach of Operating Agreement (Segali); 6) breach of fiduciary duty (Segali); 7) breach of the covenant of good faith and fair dealing (Segali and Good Works);  8) Unjust Enrichment (Segali and Good Works); 9) common counts (Segali and Good Works); 10) failure to provide access to books and records under Nevada Revised Statutes 86.241(2) and (3) (Segali and Good Works); 11) Accounting (Segali and Good Works).  He seeks damages, an order compelling Defendants "to promptly and fully produce the books and records" Troussieux has requested, prejudgment interest, and an award of attorneys' fees and costs.

### B.     The Bankruptcy Action

On November 8, 2023, Segali and his wife filed for Chapter 11 bankruptcy in the Idaho Bankruptcy Court, Case no. 23-00598 NGH ("Idaho Bankruptcy Case").  The case was subsequently converted to a Chapter 7 bankruptcy proceeding.  Idaho Bankruptcy Case, dkt. no. 58.  Pursuant to a stipulation between Segali and the United States Trustee, discharge was denied as to Segali only on November 19, 2024.  *Id.*, dkt. nos. 119, 122;  *see also*  Request for Judicial Notice in Support of Plaintiff's Default Judgment Motion ("RJN"), Exs. A, B.[1] Consequently, the automatic bankruptcy stay as to actions against property of the estate was lifted as of that date pursuant to 11 U.S.C. § 362(c)(2)(C).

### C.     The Motion

In the Motion, Troussieux asserts that he is entitled to default judgment against Segali and Good Works because both defendants were properly served and failed to appear, there is subject matter and personal jurisdiction over both defendants, and the factors articulated in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) support entry of default judgment.  He asks the Court to award:  (1) compensatory damages in the amount of $750,000; (2) pre-judgment interest from December 30, 2024 to December 17, 2025 (the hearing date originally noticed) in the amount of $71,730; (3) punitive damages in the amount of $1,875,000; (4) costs of suit in the amount of

---

[1] The Court GRANTS Plaintiff's request for judicial notice of these documents under Rule 201(b) of the Federal Rules of Evidence.  *See Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011).

United States District Court
Northern District of California

$661.78; (5) attorneys' fees in the amount of $41,520; and (6) equitable relief for an order compelling production of Good Works' books, records, and financial documents.

### D.    The Order to Show Cause and Response

After Troussieux filed the Motion, the Court issued an Order to Show Cause Why Case Should Not be Dismissed for Lack of Federal Jurisdiction ("OSC").  Dkt. no. 23. In the OSC, the Court stated:

> In the Complaint, Plaintiff alleges that this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff, who is a resident of California, and Defendants, who are citizens of Nevada. Compl. ¶ 7. Plaintiff alleges upon information and belief that "at all relevant times, Segali was a resident of the State of Nevada" and "is the managing member of Good Works, owning 90% of the interests in Good Works, and is also the agent for service of process for Good Works." Id. ¶ 5. He further alleges that "Good Works Drone Shows LLC is a limited liability company organized under the laws of the State of Nevada, with its principal place of business in Las Vegas, Nevada, and doing business nationwide, including in California." Id. ¶ 6.
>
> In his recently filed declaration in support of his pending motion for default judgment, dkt. no. 15, Plaintiff discloses that the remaining 10 percent interest in Good Works is owned by Plaintiff. Troussieux Decl., dkt. no. 15-1, ¶ 5 ("My investment provided for a 10% ownership interest in Good Works Drone Shows"). Because "an LLC is a citizen of every state of which its owners/members are citizens," *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006), Plaintiff's ownership interest in Good Works appears to destroy diversity, however, as both Plaintiff and Good Works are considered to be citizens of California. Nor does it matter that Good Works is based in Nevada and organized under the laws of Nevada or that Segali – a resident of Nevada – is its agent for service of process. *See Yang v. Colliers Int'l Grp. Inc.*, No. 3:25-CV-09680-JSC, 2026 WL 156617, at *2 (N.D. Cal. Jan. 20, 2026)(finding that "the state of incorporation and registered agent for service [of an LLC] are irrelevant to the question of diversity jurisdiction.").

OSC at 1-2.

Troussieux subsequently dismissed Good Works without prejudice pursuant to Rule 41(a)(1)(A)(i), dkt. no. 24, and submitted an OSC response in which he asserts that the case can proceed against Segali alone and that the dismissal of Good Works cures the defect as to diversity jurisdiction. Dkt. no. 25 (OSC Response) at 3-6.  In the alternative, he asked the Court to permit him to file an amended complaint to assert a federal claim under Section 10(b) of the Securities

8

Exchange Act, SEC Rule 10b-5 and *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), thereby establishing federal question jurisdiction under 28 U.S.C. § 1331. *Id.* at 6-7.

In support of his assertion that dismissal of Good Works cures the diversity defect, Troussieux contends Good Works is not an indispensable party because all of his claims against Segali "are personal and not derivative on behalf of Good Works in any manner." OSC Response at 4-5. In particular, he contends the money damages he seeks are "damages arising from the loss of Plaintiff's monetary contributions, not diminution in the LLC's value" and therefore can be "awarded against Segali without Good Works' participation—both directly and under the alter ego doctrine, which makes Segali liable for the full measure of damages regardless of whether Good Works remains a defendant." *Id.* at 5 (citing *Kanaan v. Yaqub*, No. 21-CV-09591-BLF, 2023 WL 3510381, at *4 (N.D. Cal. May 17, 2023)).

Troussieux further contends neither Good Works nor Segali "have any legally protectable interest that would be impaired if Good Works were dismissed[,]" citing the fact that both defendants "are in default and have asserted no interest in the litigation." *Id.* at 5. He further asserts that because Good Works is an alter ego of Segali, "Segali is personally liable for all of Plaintiff's claims" and thus, if Troussieux "recovers damages from Segali personally, Good Works faces no additional exposure." *Id.* at 5-6.

Troussieux argues that he "would be prejudiced if Good Works remained in this action because [he] would be required to refile his case in state court, losing the benefits of default already obtained and incurring additional delay and expense in a case where Defendants have already demonstrated unwillingness to participate." *Id.* at 6. The only interest Good Works has in this litigation, according to Troussieux, is its interest "in avoiding liability for Segali's fraud[']" but that is "not a legally protected interest warranting joinder." *Id.*

### E.   Motion Hearing

At the  June 3, 2026 Motion hearing, the Court expressed concerns about the adequacy of some of Plaintiff's claims against Segali and observed that additional evidence would be required in connection with Plaintiff's requests for damages on certain claims. Among other things, the Court questioned whether Plaintiff could assert a claim for conversion based on money that was

United States District Court
Northern District of California

paid as an investment where Plaintiff received an equity interest in the company. Likewise, the Court expressed doubt as to whether Plaintiff could recover prejudgment interest in the absence of a viable conversion claim.

As to the claim for breach of the operating agreement, the Court noted that Plaintiff had not supplied a copy of the operating agreement itself and also had not established the amount of damages to which he would be entitled based on the failure to spend the investment funds as Plaintiff had intended they be spent.

The Court also questioned whether Plaintiff could state a claim for common count as it is unclear whether Plaintiff's investment constituted a "debt" for the purposes of that claim.

The Court further found that it does not have jurisdiction over Plaintiff's Books and Records claim, which must be brought in Nevada state court.

The Court also raised doubts about awarding punitive damages and attorney's fees based on the current record.

On the other hand, the Court explained that it found the allegations and current record sufficient to warrant entry of default judgment on Plaintiff's unjust enrichment claim and an award of the $750,000 investment in damages, as discussed further below.

In response to the Court's concerns, Plaintiff stipulated to dropping the books and records claim (Claim Ten) without prejudice and all of his remaining claims except the unjust enrichment claim to recover $750.000 (Claim Eight) with prejudice. He has also dropped his request for an award of punitive damages and attorney fees. Following the hearing, Plaintiff submitted a copy of the Operating Agreement and evidence of the costs he seeks. *See* dkt. nos. 31, 32.

The Court addresses below only whether default judgment should be entered as to Plaintiff's unjust enrichment claim as he has stipulated to the dismissal of the remaining claims.

## III.   ANALYSIS

### A.   Legal Standards Governing Default Judgment

After default has been entered against a party, a district court may grant an application for default judgment in its discretion. See Fed. R. Civ. P. 55(b)(2). If the court is satisfied that jurisdiction is proper and that service of process upon the defendant was adequate, it then

considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986). In making its decision, the court takes all factual allegations in the complaint, except those relating to damages, as true. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).

### B.    Subject Matter Jurisdiction

As discussed above, Trousieux seeks to cure the defect in diversity jurisdiction resulting from the inclusion of Good Works as a defendant by dismissing that defendant from the case without prejudice.  It is well established that where a defendant's citizenship gives rise to a jurisdictional defect, the defect can be cured by dismissing that defendant and retaining jurisdiction as to the remaining defendants so long as the dismissed defendant is not an indispensable party, " 'for if their interests are severable and a decree without prejudice to their rights may be made, the jurisdiction of the court should be retained and the suit dismissed as to them.' " *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) (quoting *Horn v. Lockhart*, 17 Wall. 570, 579 (1873)).   Furthermore, "it is well settled that Rule 21 [of the Federal Rules of Civil Procedure] invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989). Thus, to decide whether there is subject matter jurisdiction over this case, the Court here must determine whether Good Works is a dispensable party.

Joinder of parties is governed by Rule 19 of the Federal Rule of Civil Procedure,[2] which

---

[2] Rule 19 provides, in relevant part:

> (a)  Persons Required to Be Joined if Feasible.

11

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) Venue. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed.R.Civ.P. 19(a), (b).

12

imposes a three-step inquiry: "1. Is the absent party necessary (i.e., required to be joined if feasible) under Rule 19(a)? 2. If so, is it feasible to order that the absent party be joined? 3. If joinder is not feasible, can the case proceed without the absent party, or is the absent party indispensable such that the action must be dismissed?" *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (citation omitted). "A party may be necessary to some claims and not others, . . . and the court may dismiss some claims under Rule 19 while allowing others to proceed[.]" *Allegro Consultants, Inc. v. Wellington Techs., Inc.*, No. 13-CV-02204-BLF, 2014 WL 4352344, at *6–7 (N.D. Cal. Sept. 2, 2014) (citing *Lyon v. Gila River Indian Comty.*, 626 F.3d 1059, 1068 (9th Cir. 2010); *EEOC v. Peabody Western Coal Co.*, 610 F.3d 1070, 1083 (9th Cir. 2010)).

Where the party at issue is a corporation or limited liability company, courts have found that " '[a]n archetypal example of a necessary and indispensable party is a corporation that was not joined in a derivative suit by one of its shareholders.'" *Kanaan v. Yaqub*, No. 21-CV-09591-BLF, 2023 WL 3510381, at *3 (N.D. Cal. May 17, 2023) (quoting *Azoulai v. La Porta*, No. CV 15-06083-MWF-PLA, 2016 WL 9045852, at *2 (C.D. Cal. Jan. 25, 2016)). The court in *Kanaan* explains, " '[b]ecause a "company has a legal existence separate from its members, . . . a corporation which suffers damages through wrongdoing by its officers and directors must itself bring the action to recover the losses thereby occasioned." ' " *Id.* (quoting *Azoulai*, 2016 WL 9045852, at *2 (quoting *PacLink Commc'ns Int'l, Inc. v. Superior Court*, 90 Cal. App. 4th 958, 965 (2001))). Thus, " '[c]ourts have recognized for decades that a derivative action may not proceed without the corporation joined either as plaintiff or, if the corporation's interests are antagonistic to those of the shareholder, as a defendant.' " *Id.* (quoting *Azoulai*, 2016 WL 9045852, at *2). The same rule applies to limited liability companies under both California and Nevada law. *Id.* (California); Nev. Rev. Stat. Ann. § 86.381 ("A member of a limited-liability company is not a proper party to proceedings by or against the company, except where the object is to enforce the member's right against or liability to the company.").

" 'In diversity actions, the characterization of an action as derivative or direct' . . . 'is a question of state law.' " *Simon v. Mann*, 373 F. Supp. 2d 1196, 1198 (D. Nev. 2005) (quoting *Sax*

13

*v. World Wide Press, Inc.*, 809 F.2d 610, 613 (9th Cir. 1987)). Courts generally apply the law of the state of incorporation when they make this determination, exception in "unusual cases" where "with respect to the particular issue, some other state has a more significant relationship . . . to the parties and the corporation." *Simon v. Mann*, 373 F. Supp. 2d 1196, 1198 (D. Nev. 2005) (quoting The Restatement (Second) of Conflict of Laws § 306 (1971)). Here, the Court concludes that most of Troussieux's claims are direct claims rather than derivative claims regardless of whether California or Nevada law is applied.

"Under California law, an action is direct when a shareholder sues for injury to the shareholder's interest (or the interest of a class of shareholders)." *Pratt v. Higgins*, No. 22-CV-04228-HSG, 2024 WL 628362, at *5 (N.D. Cal. Feb. 14, 2024) (citing *Schuster v. Gardner*, 127 Cal. App. 4th 305, 311–12 (2005)). "In contrast, the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Id.* (citing *PacLink Commc'ns Int'l, Inc. v. Superior Court*, 90 Cal. App. 4th 958, 964 (2001)). Thus, "district courts within the Ninth Circuit have concluded that 'if the gravamen of the wrong alleged in a complaint is an injury to a limited liability company, affecting its members only by diminishing their stake in the company, the suit is derivative.' " *Id.* (quoting *Kanaan v. Yaqub*, 2023 WL 3510381, at *3). "In contrast, district courts have found that claims brought by one LLC owner against another for breach of contract, declaratory relief, or fraud are not derivative but personal to the plaintiff." *Id.* (quoting *Kanaan v. Yaqub*, 2023 WL 3510381, at *3).

In *Kanaan*, for example, the plaintiff had invested in a limited liability company and asserted claims against the majority owner of the LLC and the LLC itself, invoking federal jurisdiction based on diversity. As here, the Court found that the plaintiff and the LLC were "necessarily . . .citizens of the same state because an LLC is a citizen of every state of which its owners/members are citizens" and the plaintiff therefore dismissed the LLC to cure the diversity defect. 2023 WL 3510381, at *1. Addressing the individual defendant's challenge to subject matter jurisdiction, the Court found that the LLC was a dispensable party and therefore that there

14

was subject matter jurisdiction as to the claims against the remaining defendant. *Id.*

The court in *Kanaan* addressed each of the plaintiff's claims, finding that the "gravamen" of the claims was the individual defendant's "attempts to squeeze [the plaintiff] out of the LLC." *Id.* at * 4. In particular, the court found as follows:

> Claim 1, for breach of fiduciary duty, alleges that "Defendant Yaqub is a controlling interest holder and member of The LLC, and therefore owed fiduciary duties of care and fidelity to Plaintiff as a noncontrolling minority interest holder of The LLC." FAC ¶ 35. Claim 1 alleges that Yaqub violated his fiduciary duties to Kanaan in numerous ways, including by failing to provide Kanaan with notice of alleged capital contribution calls, falsifying documents related to capital contribution calls, and acting in bad faith to reduce Kanaan's 30% ownership interest in the LLC to 8%. FAC ¶ 38. Claim 2, for breach of contract, alleges that both Yaqub and Kanaan are parties to the LLC's Operating Agreement, and that Yaqub breached the Operating Agreement in several ways, including by failing to provide Kanaan with notice of any alleged capital contribution calls, falsifying documents related to capital contribution calls, and acting in bad faith to reduce Kanaan's 30% ownership interest in the LLC to 8%. FAC ¶ 47. Claim 3, for breach of the implied covenant of good faith and fair dealing, alleges that Yaqub breached the implied covenant by using his authority as a majority interest holder in bad faith to deprive Kanaan of benefits to which he was entitled as a minority interest holder in the LLC. FAC ¶¶ 53-56.
>
> Claim 4, for unfair competition under California Business & Professions Code § 17200, alleges that Yaqub has engaged in unfair business practices by violating California public policies designed to protect minority interest holders, and has engaged in fraudulent business practices by falsifying minutes of LLC meetings and fraudulently amending the LLC's Operative Agreement in order to divest Kanaan of his ownership interest in the LLC. FAC ¶¶ 60-61. Claim 5, for declaratory and injunctive relief, seeks resolution of an actual controversy between Yaqub and Kanaan regarding their respective ownership interests in the LLC. FAC ¶ 69. Claim 6, for fraudulent concealment, alleges that Yaqub intentionally failed to disclose material facts to Kanaan, including that Yaqub initiated a capital call, amended the LLC's Operating Agreement, and falsified minutes. FAC ¶ 75.
>
> All of these claims assert wrongful conduct by Yaqub that caused harm to Kanaan individually – divestiture of the majority of his interest in the LLC – which is separate and apart from any harm caused to the LLC itself. Yaqub correctly points out that the FAC contains other allegations of misconduct by Yaqub that harmed the LLC, for example, allegations that Yaqub colluded with Seeley to use LLC funds for personal expenses and failed to renew the liquor license for a property owned by the LLC. FAC ¶¶ 38(c), 47(c), 75(d). Any claims based on those allegations would be derivative and would require joinder of the LLC to proceed. However, reading the FAC as a whole, the Court concludes that the allegations regarding Yaqub's

15

collusion in the misuse of LLC funds and failure to renew the liquor license are not central to Kanaan's claims.

2023 WL 3510381, at *4.

Applying similar reasoning here, the Court finds that the gravamen of Troussieux's claims are personal because they seek to recover the $750,000 investment that Segali induced him to make through fraud and misrepresentations (Claims Two and Three) and which Segali allegedly converted for his own personal use (Claims One, Eight and Nine), and to hold Segali liable for breaching his fiduciary duties (Claim Six) owed as manager to Troussieux as a member of the LLC, along with other contractual obligations (Claims Four, Five, Seven, and Eleven).[3]

Similarly, Nevada law provides an exception to the general rule that "a claim by one shareholder against another shareholder of the same company must be brought 'derivatively,' meaning on behalf of the company." *Gephart v. Merryman*, No. 218CV01670GMNCWH, 2018 WL 11266888, at *3 (D. Nev. Nov. 6, 2018) (citing *Simon v. Mann*, 373 F. Supp. 2d 1196, 1198 (D. Nev. 2005)). "That exception permits a minority shareholder in a closely held corporation to bring a direct action against another shareholder, and the company need not be named as a party in the lawsuit." *Id.* (citing *Carstarphen v. Milsner*, 693 F. Supp. 2d 1247, 1253 (D. Nev. 2010)). Nevada courts "examine the particular circumstances of [the] case to determine whether [they] should permit the litigation to proceed as a direct action[,]" considering "whether the plaintiffs had alleged an individual injury; whether there was a danger of subjecting the defendant to multiple lawsuits or unfair recovery; whether there were outside creditors who would have priority for any remedies; and whether relief to the corporation would mostly benefit the alleged wrongdoer in control of the corporation, and thus the plaintiff could not obtain adequate relief through a derivative lawsuit." *Carstarphen v. Milsner*, 693 F. Supp. 2d at 1252 (applying Nevada law).

Here, the allegations in the complaint, which the Court deems to be true by virtue of

---

[3] The Court notes that Claim Ten, seeking access to Good Work's books and records, is asserted under Nev. Rev. Stat. Ann. § 86.241.  However, "[a]ny action to enforce any rights arising under NRS 86.241 must be brought in the district court for the county in which the limited-liability company has its principal place of business or if such principal office is not located in this State, the county in which the company's registered office is located." Nev. Rev. Stat. Ann. § 86.243(2). Furthermore, that court has "exclusive jurisdiction to determine whether or not the person seeking such records is entitled to the records sought." Nev. Rev. Stat. Ann. § 86.243(3).  As discussed above, Plaintiff has stipulated to the dismissal of this claim without prejudice.

United States District Court
Northern District of California

Segali's default, establish that Segali owns 90% of the shares of Good Works and that Troussieux owns the remaining 10%. Because there are only two shareholders, the Court finds that Good Works is closely held.[4] Further, Troussieux has alleged he suffered an individual injury, namely, he was defrauded of $750,000 by Segali, who also breached his fiduciary duty to Troussieux – the only other shareholder – by failing to use the funds Troussieux invested in Good Works to purchase drones, which were necessary for the business to succeed, as promised. There is nothing in the record that suggests that there are outside creditors who would have priority as to these funds[5] and if the action were brought derivatively, any recovery would largely benefit Segali rather than Troussieux. Finally, while there is a possibility that Troussieux could bring a separate action against Good Works in a different venue, the Court finds that that factor is outweighed by the considerations discussed above. Therefore, the Court concludes that under Nevada law, Troussieux's claims fall under the exception that allows him to assert direct claims against Segali.

For these reasons, the Court finds that under both Nevada and California law, Good Works is not an indispensable party and therefore, that there is subject matter jurisdiction in this case based on diversity jurisdiction.

### C.   Service and Personal Jurisdiction

Plaintiff served the complaint and summons on Segali by personal service on July 27, 2025. Dkt. no. 8 (Proof of Service). Therefore, service was adequate. *See* Fed.R.Civ.P. 4(e)(2)(A). The Court also finds that it has personal jurisdiction over Segali.

---

[4] The Court notes, however, that Plaintiff has supplied the declaration of an individual, Jesse Asoau, who states that Segali also promised *him* a 10% ownership interest in return for Asoau relocating to Las Vegas and working for Good Works. Asoau Decl., ¶¶ 4-6. Likewise, the Operating Agreement, which Plaintiff supplied after the motion hearing, indicates that Asoau owned a 10% share in Good Works. *See* dkt. no. 31. Whether there are two shareholders or three, however, the Court concludes Good Works was closely held.

[5] This is not to say that there is no evidence in the record that Good Works does not have other creditors. Asoau states in his declaration that as an employee of Good Works, he "receiv[ed] calls and notifications from . . . vendors, including FedEx/freight couriers and designers, noting that they were not being paid." Aoau Decl. ¶ 12. According to Asoau, he himself was never paid the salary promised to him or the relocation fees, even as Segali lived a "lavish" lifestyle, including "spending $20,000 on a blackjack game" and "spending $800 on caviar at dinner." *Id.* ¶ 17. Likewise, Troussieux states in his declaration that he is aware of multiple individuals and companies who claim Segali owes them tens of thousands of dollars. *See* Troussieux Decl., ¶¶ 12-13. There is no evidence, however, that any of them have priority over Troussieux with respect to the money damages he seeks in this case.

United States District Court
Northern District of California

Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Dole Food Company, Inc. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002) (citing Cal. Code Civ. Proc. § 410.10)). The exercise of specific jurisdiction over a nonresident defendant requires three elements:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Id*. at 1111 (citation omitted). "[T]he purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test derived from *Calder v. Jones*, 465 U.S. 783 (1984)," which "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id*.

Here, Troussieux has offered evidence in the form of his declaration that Segali knew that Troussieux was a California resident and actively solicited Troussieux's $750,000 investment in Good Works, including in personal meetings with Troussieux in California. *See* Troussieux Decl., ¶ 3. Furthermore, the Contribution Agreement, which was signed by Segali, lists Troussieux's address in San Raphael, California in the recitals. Compl., Ex. 1. The Court finds that this evidence is sufficient to establish purposeful availment and further concludes that exercise of personal jurisdiction over Segali comports with "fair play and substantial justice." Therefore, the Court concludes that there is personal jurisdiction over Segali in this case.

### D.    *Eitel*  Factors

Having found that service was adequate and that the Court has jurisdiction, the Court considers the  factors set forth in *Eitel*.  The Court concludes these factors, on balance, support entry of default judgment.

### 1. Possibility of prejudice to plaintiff

The first factor established by the Ninth Circuit in *Eitel* concerns whether the plaintiff would be prejudiced by denial of default judgment. *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D. Cal. 2010). Troussieux will be prejudiced by denial of default judgment. Although there may be an alternative forum in Nevada, there is nothing in the record to suggest that Segali is any more likely to respond to an action there. Thus, if this Court denies Troussieux's request for default judgment, Troussieux will be left without a remedy. *See PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Accordingly, this factor weighs in favor of entry of default judgment.

### 2. Merits of plaintiff's claims and sufficiency of complaint

Courts also must consider the sufficiency of the allegations and the substantive merits of the plaintiff's claims to determine whether entry of default judgment is warranted. *Eitel,* 782 F.2d at 1471.

#### a. Choice of Law

As a preliminary matter, the Court must determine whether to evaluate Plaintiff's claims under California law or Nevada law (the law specified in the Contribution Agreement). When confronted with a choice-of-law question, a federal district court sitting in diversity applies the choice-of-law rules of the forum state to determine which state's substantive law to apply. *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1020, 1035 (N.D. Cal. 2012) (citing *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005)). Because this Court is sitting in diversity in California, it applies California's choice-of-law rules.

In *Nedlloyd Lines B.V. v. Superior Court*, the California Supreme Court set forth rules for determining when contractual choice of law provisions should be enforced. 3 Cal. 4th 459, 466 (1992). It explained that California applies the principles set forth in the Restatement (Second) of Conflict of Laws, section 187, which provides that such provisions are generally enforced unless 1) the chosen state has "no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice;" or 2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than

United States District Court
Northern District of California

19

the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id*.   However, in *Nedlloyd*, the court applied the law of California (the forum state) because the parties had not supplied the court with evidence of the relevant aspects of the law that was designated, Hong Kong law.  3 Cal. 4th at 469 n.7.  Similarly, the Ninth Circuit has noted that where the parties have not proven the content of foreign law, courts typically apply the law of the forum state.  *See Commercial Ins. Co. of Newark, N. J. v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977) (citing Fed. R. Civ. P. 44.1; Restatement (Second) of Conflicts of Laws, § 136, comment h).  The reason for this approach is set forth in the Restatement, which explains:

> [W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law . . ..  The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties . . ..  When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum. . . .

Restatement (Second) of Conflicts of Laws § 136, comment h.

Applying the principles of *Nedlloyd* and the Restatement discussed above, the Court concludes that it is proper to apply California law in evaluating Plaintiff's claims.  Although the choice of law provision in the Contribution Agreement specifies Nevada law, Segali has not appeared to enforce that provision.  Therefore, the Court finds that he has acquiesced to the application of California law.

### b.   Unjust Enrichment

Plaintiff alleges that Segal was unjustly enriched because: "Plaintiff conferred a significant financial benefit upon Defendants, including the $750,000 Capital Contribution[;] . . . Defendants accepted and retained the benefit conferred by Plaintiff[;] . . . [and] Defendants were unjustly enriched by receiving Plaintiff's $750,000 Capital Contribution for capital and equipment that, on information and belief, were never effectuated or purchased."  Compl. ¶¶ 79-81.  The elements for unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." *Elder v. Pac. Bell Tel. Co.*, 205 Cal. App. 4th 841, 857 (2012) (citations omitted).  "When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-

United States District Court
Northern District of California

contract claim seeking restitution.' " *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014)). The Court finds that Plaintiff has adequately alleged this claim. *See Marani v. Cramer*, No. 19-CV-05538-YGR (DMR), 2025 WL 2645901, at *1 (N.D. Cal. Aug. 11, 2025), report and recommendation adopted, No. 4:19-CV-05538-YGR, 2025 WL 3110649 (N.D. Cal. Sept. 25, 2025) (finding that where plaintiff alleged that fraudster defendant "lur[ed] unwitting individuals" like the plaintiff to "invest" in them with promises of high returns that never materialized a claim for unjust enrichment was adequately alleged). Therefore, this factor supports entry of default judgment as to the unjust enrichment claim.

### 3. Amount of Money at Stake

The fourth *Eitel* factor balances the amount of money at stake in the claim in relation to the seriousness of the defendant's conduct. *Eitel*, 782 F.2d at 1471-72. Here, the amount of money sought is substantial but consistent with the funds Troussieux transferred to Segali. Therefore, this factor favors entry of default judgment.

### 4. Possibility of Disputes

While Segali might dispute Troussieux's allegations, he has failed to appear in this case to challenge them and the factual allegations in the Complaint are deemed to be true by virtue of Segali's default. Therefore, this factor favors entry of default judgment.

### 5. Possibility of excusable neglect

The sixth *Eitel* factor weighs whether the defendant's default may have been the product of excusable neglect. Here, Segali was properly served, and there is no indication that his default was due to excusable neglect. This factor therefore favors entry of default judgment. Policy in favor of judgment on the merits

### 6. Policy Favoring Decision on the Merits

Finally, the seventh *Eitel* factor considers the policy that generally disfavors default judgments because "cases should be decided upon their merits whenever reasonably possible However, a resolution of the dispute on the merits it not possible because Segali has failed to appear. Therefore, this factor favors entry of default judgment.

21

\* \* \*

In sum, the Court finds that entry of default judgment is warranted under the *Eitel* factors on Plaintiff's unjust enrichment claim.

### E.    Remedy

#### 1.  Compensatory Damages

Plaintiff seeks to recover the $750,000 he invested in Good Works as compensatory damages.  The Court finds that this is the proper measure of restitution damages and recommends that it be awarded in full.

#### 2.  Costs

Plaintiff seeks an award of $661.78 in costs for the following: 1) $405.00 for the filing fee in this action; 2) $118.74 for service on Segali; 3) $118.74 for service on Good Works; 4) printing costs of $4.90; and 5) $14.40 for sending the Motion for Default Judgment to Segali by certified mail.  *See* dkt. no. 32. Plaintiff is entitled to an award of costs as the prevailing party, *see* Civ.L.R. 54-3, and has supplied evidence of these costs.  The Court finds the requested costs to be reasonable except that Plaintiff is not entitled to the cost of service on Good Works given that that defendant was dismissed from the case.  Therefore, it is recommended that the Court award $543.04 in costs.

### IV.    CONCLUSION

For the reasons stated above,  it is recommended that the Court GRANT the Motion for Default Judgment as to Defendant Segali on Plaintiff's unjust enrichment claim (Claim Eight) and award $750,000 in restitution and $543.04 in costs.  The final judgment in this case should be entered against Segali only and should make clear that the books and records claim is dismissed without prejudice while the remaining claims against Segali, other than the Unjust Enrichment claim, are dismissed *with* prejudice.  Plaintiff shall serve a copy of this Report and

Recommendation on Defendant Segali and file proof of service within one week of the date of this Order. Objections to this Report must be filed within fourteen days of the date on which it is received.

Dated: June 10, 2026

_____
JOSEPH C. SPERO
United States Magistrate Judge